This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-41240**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**BRENTON RAEL,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Jason Lidyard, District Court Judge**

Raúl Torrez, Attorney General
Teresa Ryan, Assistant Solicitor General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**MEDINA, Chief Judge.**

**{1}** The opinion filed May 27, 2025, is hereby withdrawn, and this opinion is substituted in its place, following Appellee's timely motion for rehearing, which this Court has denied. A jury convicted Defendant of one count of kidnapping in the first degree, contrary to NMSA 1978, Section 30-4-1(A)(4) (2003); one count of battery, contrary to NMSA 1978, Section 30-3-4 (1963); one count of aggravated assault with intent to kill, contrary to NMSA 1978, Section 30-3-3 (1977); one count of attempted murder in the first degree, contrary to NMSA 1978, Sections 30-28-1 (1963, amended 2024) and 30-

2-1(A)(1) (1994); one count of aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963); one count of conspiracy, contrary to NMSA 1978, Sections 30-28-2 (1979) and 30-2-1(A)(1); and one count of robbery, contrary to NMSA 1978, Section 30-16-2 (1973). On appeal, Defendant argues that the following convictions violate double jeopardy: (1) kidnapping and battery, (2) kidnapping and attempted murder, (3) kidnapping and aggravated assault with intent to kill, and (4) aggravated assault with intent to kill and aggravated assault with a deadly weapon. Further, Defendant contends: (1) the district court abused its discretion in admitting physical evidence of a gun; (2) there was insufficient evidence to convict Defendant because the State's case was based largely on accomplice testimony; and (3) Defendant received ineffective assistance of counsel. We vacate the attempted murder, aggravated assault with intent to kill, and aggravated assault with a deadly weapon convictions as we conclude that they violate Defendant's constitutional protection against double jeopardy and remand to the district court to amend the judgment and sentence accordingly. Otherwise, we affirm.

## BACKGROUND

**{2}** On an evening in February 2020, Kayla Ferran (Victim) was walking along a road, when her drug dealer, Defendant, stopped the vehicle he was driving nearby. Victim walked up to the vehicle and Defendant told her to get in the vehicle because he wanted to talk to her. Victim testified that Defendant was holding a black gun on his lap when he told her to get in the vehicle. According to LeAnn Romero, a passenger in the vehicle, Defendant believed Victim had robbed him a couple of weeks prior. Victim got in the back seat of the vehicle and Defendant asked Victim where his "stuff" was at and stated that he wanted his money.

**{3}** Defendant drove for a short time then stopped the vehicle again and pulled Victim out of the vehicle by her hair and threw her to the ground where he then began striking Victim with his gun, kicking and punching her and stating that he was "missing drugs." When Defendant was finished beating Victim, he told Romero to get in the back seat and either told or placed Victim in the front seat of the vehicle. Defendant then handed Romero a black handgun and told her to make sure Victim didn't do anything stupid. According to Victim, Romero, whom she did not know at the time, placed a rope around Victim's neck after which Defendant drove to a house, identified as belonging to "Oso."

**{4}** At this location, Defendant's third stop of the evening, Romero placed a blindfold on Victim and then wrapped the blindfold with tape around Victim's head and down past her nose. Defendant and Romero were in the vehicle with Victim for thirty to sixty minutes and drove to another residence while Victim's face was covered. Then, Defendant drove to another location where Defendant removed the tape and blindfold from Victim's head and face. Victim saw a trailer belonging to Kevin Gonzales, a person she had used drugs with before. Romero placed a band around Victim's neck and pulled Victim out of the car and into the trailer.

**{5}** While inside the trailer, Victim observed Defendant with or near a gun and heard Romero say she would shoot Victim. While in the trailer, Defendant sent Romero and Gonzales to get gas and do other errands. When Romero and Gonzales returned, they discussed cleaning the evidence off Victim. Towards that end, they directed Victim to take off her clothes and get in the shower. Romero then poured an entire container of bleach all over Victim causing Victim's eyes to burn. Victim was then permitted to put her shorts and jacket on but not the rest of her clothes.

**{6}** Victim heard Defendant and Romero discussing injecting Victim with heroin to make Victim's death appear to be an accidental overdose or, alternatively, shooting her. Defendant, Romero, and Gonzales then placed Victim back in the vehicle. Defendant drove to a bridge, the final stop, where Romero injected Victim with heroin. Romero and Gonzales then dragged Victim out of the vehicle to the middle of the bridge and pushed her into the river. Victim survived the fall and ran for help. Defendant was arrested a number of days later during which a black gun was found in the vehicle Defendant was driving.

**{7}** At the conclusion of trial, Defendant was convicted of the crimes set forth earlier in this opinion and this appeal followed.

**{8}** We withhold discussion of facts related to the evidentiary issue and the State's closing argument to the applicable analysis sections below.

## DISCUSSION

### I.      Double Jeopardy

**{9}** This case presents double description issues because it involves multiple punishments for convictions under different statutes. *See State v. Begaye*, 2023-NMSC-015, ¶ 12, 533 P.3d 1057. As a double description case, this Court applies the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223. We first ask "whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates both statutes." *Id.* "If it is unitary, we [then] consider whether it was the Legislature's intent to punish the two crimes separately." *State v. Swick*, 2012-NMSC-018, ¶ 11, 279 P.3d 747. "Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment[s] in the same trial." *Swafford*, 1991-NMSC-043, ¶ 25.

### A.      The State's Closing Argument and Arguments on Appeal Created Unique Challenges in Addressing Defendant's Double Jeopardy Violation Claims

**{10}** Generally, the question of unitary conduct, the first step of our analysis, turns on whether there is "sufficient indicia of distinctness" between the acts at issue. *Id.* ¶ 26. However, uniquely challenging issues present themselves on appeal that implicate our analysis.

**{11}** For one, given that the first degree kidnapping continued throughout the Victim's encounter with Defendant, spoken to in greater detail in the next section, Defendant's claims of double jeopardy violations cannot be disposed of through a straightforward analysis of the traditional indicia of distinctness—whether the events were "sufficiently separated by either time or space," or whether "the quality and nature of the acts or the objects and results involved are distinguishable." *See State v. Contreras*, 1995-NMSC-056, ¶ 14, 120 N.M. 486, 903 P.2d 228 (omission, internal quotation marks, and citations omitted).

**{12}** For another, the approach by the State on appeal of distinguishing Defendant's conduct as it satisfies each conviction contrasts with its approach at trial. The State, in its briefing, maintains that the conduct supporting each crime was completely separate based on a carefully constructed, neatly organized progression of individual crimes with each beginning and ending before the next commenced. In doing so, the State relies on evidence and court filings but disregards the arguments the State presented to the jury. However, in *State v. Lorenzo*, 2024-NMSC-003, ¶ 11, 545 P.3d 1156, our Supreme Court rejected the state's unitary conduct argument that did not "match its presentation at trial." In *Lorenzo,* had the state "opted for a different presentation at trial, it is possible that the jury could have decided that different uses of force satisfied the element of each crime" and the Court's unitary conduct analysis "might be different." *Id.* But our Supreme Court did not permit the state to argue in the abstract about what it could have asked the jury to decide in order to avoid a finding of unitary conduct on appeal. *See id.*; *see also State v. Porter*, 2020-NMSC-020, ¶ 14, 476 P.3d 1201 (noting that the state could have prosecuted the charged offense based on different conduct and a "different" unitary conduct "analysis would be required"). Therefore, we rely on the conduct identified in the State's presentation to the jury rather than on the State's reconstructed narrative on appeal.

**{13}** Finally, it is no straightforward task to identify the conduct described at trial either, because the State in its closing argument presented various scenarios that could apply to multiple charges Defendant faced, leaving the jury to sort it out. The State encouraged the jury to select among multiple alternatives, intent shared across crimes, and multiple unspecified uses of the gun. As we explain, under such circumstances, "[w]hen the conduct underlying two convictions could be unitary under the facts, but we are unsure if the jury relied on that unitary conduct for both convictions, we nevertheless assume for the purposes of our double jeopardy analysis that the conduct was unitary because one of the options/alternatives/scenarios is legally inadequate." *State v. Simmons*, 2018-NMCA-015, ¶ 27, 409 P.3d 1030. Such a presumption is not conclusive and may be rebutted "by evidence that each crime was completed before the other crime occurred." *See State v. Sena*, 2020-NMSC-011, ¶ 54, 470 P.3d 227; *cf. State v. Phillips*, 2024-NMSC-009, ¶ 41 n.5, 548 P.3d 51 (addressing a plea entered without evidence submitted to a jury). The "proper analytical framework" for that determination "is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104 (internal quotation marks and citation

omitted); *State v. Cardenas*, 2025-NMSC-020, ¶ 58, 572 P.3d 958 (same). We proceed to consider Defendant's challenges related to the kidnapping convictions in this context.

**B.      There Is Ambiguity in the Jury Instructions and the Presentation of the Evidence as to the Commencement and Completion of the Kidnapping Offense That Implicates the Unitary Conduct Analyses**

**{14}**    A key factor in a double description analysis is the temporal relationship between the alleged violative convictions. *See Sena*, 2020-NMSC-011, ¶ 46 (determining conduct is not unitary "when one crime is completed before another is committed, or when the force used to commit a crime is separate from the force used to commit another crime").

**{15}**    Defendant's kidnapping conviction is at issue in a number of Defendant's double jeopardy violation claims. Therefore, we begin by considering how the jury understood the kidnapping timeline: both its commencement and its completion. To do so, as it relates to indicia of distinctness, we look to "the elements of the charged offenses, the facts presented at trial, and the instructions given to the jury." *Phillips*, 2024-NMSC-009, ¶ 38 (internal quotation marks and citation omitted).

**{16}**    While not binding on our analysis, we recognize the parties' characterization of the distinctions—or lack thereof—on this matter on appeal as follows. *See Lorenzo*, 2024-NMSC-003, ¶ 11 ("[T]he [s]tate's presentation on appeal does not match its presentation at trial" and "[t]he [s]tate may not now argue in the abstract about what it could have asked the jury to decide."). On appeal, Defendant does not explicitly assert a commencement of the kidnapping offense, and instead highlights that the State's theory relied on the use of "a gun to intimidate and therefore restrain [Victim,]" potentially referring to the display of the gun in Defendant's lap at the initial encounter. Defendant suggests the kidnapping was not complete until the injuries for the kidnapping occurred on the bridge at the end of the sequence of events including Defendant and Victim. The State, on appeal, contends that the kidnapping began when Defendant bound Victim's head and wrists, and the completion of the kidnapping to be either when the bleach burned Victim's eyes or when Defendant made the decision to inject Victim with heroin. Further, the State asserts that "[t]hese circumstances might tolerate, for purposes of this analysis, deeming the physical-injury element inessential to the underlying charge of kidnapping."

**{17}**    To find Defendant guilty of first degree kidnapping, the State was required to prove beyond a reasonable doubt:

1.      [D]efendant took or restrained or confined or transported [Victim] by force or intimidation by covering her face and moving her against her will;

2.      [D]efendant intended to inflict death or physical injury on [Victim];

        3.      [D]efendant inflicted physical injury upon [Victim] during the course of the kidnapping.[1]

**{18}**    In addition, the jury was instructed in part that if it found Defendant guilty of kidnapping, it must determine if the crime was committed with the use of a firearm. Considering that Victim testified the gun was on the lap of Defendant at the time of the initial stop, and Victim felt compelled to get in the car at this point and considering that the State relied on this evidence by arguing that Defendant restrained or confined Victim "by making [Victim] get in that car, by having that gun in his lap, by intimidating [Victim] to get in that car and moving her against her will," the jury may have reasonably considered that the gun was a component of the intimidation used to restrain or transport Victim, situating the commencement of the kidnapping at the initial encounter. We further observe that although the jury did not identify at what point the gun was used, the jury did return a finding that the gun was used in commission of the kidnapping. Further, the jury instructions, on their face, identify the covering of Victim's face, which happened a few stops after Victim's entering the vehicle for the first time. Accordingly, the jury instructions and the State's use of the evidence relating to the kidnapping create an ambiguity as to when the jury could reasonably have determined that the kidnapping offense began.

**{19}**    As to the completion of the offense, the jury instructions do not describe the specific facts that constituted the injury necessary to convict Defendant of first degree kidnapping. Therefore, we look to the evidence presented regarding the injuries sustained. During the State's closing argument, the State identified several injuries resulting from the kidnapping conduct that the jury could consider during their deliberations: drugs administered into Victim's vein against her will, the puncture marks left after the drugs were administered, burning after bleach was poured in her eyes, difficulty moving a couple days after the events, as well as cuts and redness. Among several possibilities, the jury could have understood that the kidnapping offense was completed as early as the bleach being poured into Victim's eyes or as late as the injection of heroin into Victim against her will at the final stop on the bridge that evening.

**{20}**    In light of these ambiguities, as the timeline relates to analysis of other convictions at issue, we will assume that the jury relied on a theory where the kidnapping began at Defendant's first stop of the evening when he displayed the gun to Victim and told her to get in the car and was not complete until the last stop of the evening on the bridge. *See Simmons*, 2018-NMCA-015, ¶ 27. Following from this, we observe that all of the convictions challenged on appeal occurred concurrent to the ongoing kidnapping offense.

**{21}**    Prior to addressing the kidnapping conviction in relation to the various alleged double jeopardy violations that arise from it, we address Defendant's claim that the

---

[1]Having set forth the kidnapping jury instruction here, we will not repeat the instruction when addressing Defendant's remaining double jeopardy arguments involving his kidnapping conviction.

aggravated assault with intent to kill and the aggravated assault with a deadly weapon violate double jeopardy.

### C.     The Aggravated Assault With Intent to Kill and Aggravated Assault With a Deadly Weapon

**{22}**    Defendant argues that the State presented a theory, in its closing argument, of one ongoing assault culminating in the conduct underpinning his conviction for aggravated assault with intent to kill. The State's presentation of this issue on appeal does not match the presentation of the evidence and arguments at trial, and we will not consider it here. *See Lorenzo*, 2024-NMSC-003, ¶ 11.

### 1.     The Conduct Relied Upon for the Aggravated Assault With a Deadly Weapon and Aggravated Assault With Intent to Kill Convictions Was Unitary

**{23}**    To find Defendant guilty of aggravated assault with intent to kill, the State was required to prove beyond a reasonable doubt:

1.    [D]efendant displayed a firearm to [Victim];

2.    [D]efendant's conduct caused [Victim] to believe [D]efendant was about to intrude on [Victim]'s bodily integrity or personal safety by touching or applying force to [Victim] in a rude, insolent or angry manner;

3.    A reasonable person in the same circumstances as [Victim] would have the same belief;

4.    [D]efendant intended to kill [Victim].

**{24}**    To find Defendant guilty of aggravated assault with a deadly weapon, the State was required to prove beyond a reasonable doubt:

1.    [D]efendant displayed a firearm to [Victim];

2.    [D]efendant's conduct caused [Victim] to believe [D]efendant was about to intrude on [Victim's] bodily integrity or personal safety by touching or applying force to [Victim] in a rude, insolent or angry manner;

3.    A reasonable person in the same circumstances as [Victim] would have the same belief;

4.    [D]efendant used a firearm.

**{25}** The language of the elements overlaps entirely barring one: aggravated assault with the intent to kill requires "[D]efendant intended to kill [Victim]" and aggravated assault with a deadly weapon requires that "[D]efendant used a firearm," while both sets of jury instructions used at trial required that "[D]efendant displayed a firearm." The instructions do not indicate which particular conduct satisfied these elements. Further, as the State highlighted during closing, "multiple times throughout the evening, the gun was present and when it wasn't present, it wasn't far away." The evidence presented corroborates this statement.

**{26}** Among several instances of the gun's presence testified to, Victim saw the gun on Defendant's lap when she first walked up to the car, it was used to threaten Victim while she was in the car, and it was with or near Defendant when Victim was in the trailer. Similarly, there were threats to Victim, both implied and express, throughout the evening. Accordingly, we are unable to discern from the evidence presented distinguishing characteristics between a distinct aggravated assault with a deadly weapon charge and another distinct aggravated assault with intent to kill charge.

**{27}** Indicia of distinctness are not apparent based on the evidence or the jury instructions relating to these convictions. As "'it reasonably can be said that the conduct is unitary,'" we conclude it was here. *See State v. Porter*, 2020-NMSC-020, ¶ 12 (quoting *Swafford*, 1991-NMSC-043, ¶ 28).

**2. The Legislature Did Not Intend to Permit Multiple Punishments Under These Two Statutes for the Same Conduct**

**{28}** Having determined that the conduct relied on to convict Defendant of the two offenses was unitary, we proceed to the second *Swafford* prong: "whether the Legislature intended to create separately punishable offenses." *State v. Reed*, 2022-NMCA-025, ¶ 8, 510 P.3d 1261 (text only) (citation omitted). Because the aggravated assault with intent to kill and aggravated assault with a deadly weapon statutes do not expressly permit multiple convictions, *see* §§ 30-3-3; -3-2A, and can be violated in multiple ways, we consider whether the Legislature intended multiple punishments under the circumstances in this case, including the State's theory for each offense. *See Begaye*, 2023-NMSC-015, ¶¶ 21, 23-24. As articulated above, during closing, the State presents multiple options of conduct that could be relied upon to support aggravated assault but failed to delineate one particular occurrence of aggravated assault with a deadly weapon and one particular occurrence of aggravated assault with intent to kill. Thus, our "inquiry is over and the statutes are the same for double jeopardy purposes—punishment cannot be had for both." *See Swafford*, 1991-NMSC-043, ¶ 30.

**{29}** The aggravated assault with a deadly weapon conviction, a fourth degree felony, and the aggravated assault with intent to kill conviction, a third degree felony, are violative of double jeopardy. Therefore, the aggravated assault with a deadly weapon conviction must be vacated as the lesser of the two offenses. *See Montoya*, 2013-NMSC-020, ¶ 55 ("[W]here one of two otherwise valid convictions must be vacated to

avoid violation of double jeopardy protections, we must vacate the conviction carrying the shorter sentence.").

## D.     Kidnapping and Aggravated Assault With Intent to Kill

**{30}**    Having vacated the aggravated assault with deadly weapon conviction on double jeopardy grounds, we next address whether the aggravated assault with intent to kill and the kidnapping convictions violate double jeopardy. On the issue of unitary conduct and indicia of distinctness as to the kidnapping and aggravated assault with intent to kill convictions, we cannot conclude, based on the evidence presented and arguments, that the jury reasonably could have relied on independent factual bases. *See Cardenas*, 2025-NMSC-020, ¶ 58.

**{31}**    Kidnapping is an offense with multiple elements, and the State encouraged the jury to consider alternative evidence for many of the different elements, most of which overlap with each other in some way. Of the four first degree kidnapping elements, the State proposed that the different evidence could support multiple versions of three elements; (1) Defendant took or restrained or confined or transported Victim; (2) Defendant intimidated and thereby made Victim get in the car by having the gun in his lap; and (3) Defendant physically injured Victim.[2] In closing, for the aggravated assault with intent to kill charge, the State pointed to evidence that the gun was present and used throughout the evening and identified three specific moments—in Defendant's lap at the beginning, when Romero held it to Victim's head, and when Defendant forced Victim to strip. The State noted that Defendant's discussions "throughout" showed an intent to kill. The task of sorting through these arguments and aligning the facts in order to locate an independent factual basis is daunting for us, much less the jury. On appeal, the State may have articulated a path through the arguments that established distinct conduct—but our question is whether the jury reasonably could have done so with the evidence, instructions, and argument before them. *See id.* On this record, we cannot conclude that such a task could be reasonably accomplished. Accordingly, we proceed on the unrebutted presumption that the conduct for the aggravated assault with intent to kill and kidnapping charges was unitary.

**{32}**    We therefore proceed to the second *Swafford* prong: "whether the Legislature intended to create separately punishable offenses." *State v. Reed*, 2022-NMCA-025, ¶ 8, 510 P.3d 1261 (text only) (citation omitted). Because the aggravated assault with intent to kill and kidnapping statutes do not expressly permit multiple convictions, *see* §

---

[2]As to the completion of the offense, we reject that "[t]hese circumstances might tolerate, for purposes of this analysis, deeming the physical-injury element inessential to the underlying charge of kidnapping" as the State suggests. Such an issue was squarely addressed in *State v. Serrato*, 2021-NMCA-027, 493 P.3d 383. There, the majority determined, in the context of an assertion of a double jeopardy violation regarding a first degree kidnapping, "our review of the case law confirms that our task in a double jeopardy analysis is to examine not only the conduct required for the base crime of the greater offense, but also that required to elevate the base crime to a higher felony degree." *Id.* ¶ 26. As a result, to determine when the first degree kidnapping conduct was complete, we must consider when all of the elements were satisfied, including the physical injury requirement.

30-3-3; § 30-4-1(A)(4), we consider whether the Legislature intended multiple punishments under the circumstances in this case. *See Begaye*, 2023-NMSC-015, ¶ 21.

**{33}**     We first determine whether the modified *Blockburger* test or the strict-elements *Blockburger* test applies. *See Blockburger v. United States*, 284 U.S. 299 (1932); *see also Begaye*, 2023-NMSC-015, ¶ 23 (providing that the reviewing court must "examine the statutes at issue to discern whether the modified or strict-elements *Blockburger* test applies," and "should then apply either the modified or the strict-elements test—but not both"). The aggravated assault with intent to kill statute allows the assault to be accomplished by "assaulting another with intent to kill or commit any murder, mayhem, criminal sexual penetration in the first, second or third degree, robbery or burglary," and the kidnapping statute allows the crime to be accomplished by "unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception," each of which can be achieved in multiple ways. *See* §§ 30-3-3; 30-4-1(A)(4). Accordingly, we apply the modified *Blockburger* test.

**{34}**     In applying the modified *Blockburger* test, we examine each offense, looking to the State's theory of each offense, rather than the statutory elements in the abstract. *See State v. Branch*, 2018-NMCA-031, ¶ 25, 417 P.3d 1141. If under the State's theory of the case as presented to the jury all elements of one offense are "subsumed within the other, then the analysis ends and the statutes are considered the same for double jeopardy purposes." *See State v. Silvas*, 2015-NMSC-006, ¶ 12; *see also Begaye*, 2023-NMSC-015, ¶ 24 ("We examine each offense keeping in mind that determining whether one offense subsumes the other *depends entirely on the* [s]*tate's theory of the case*." (emphasis added) (alteration, internal quotation marks, and citation omitted)).

**{35}**     The State did not clearly delineate separate theories of these two crimes at trial. The use and threat of the gun throughout was a component of the State's theory for both the aggravated assault with intent to kill and the kidnapping. For the aggravated assault with intent to kill conviction, the State argued that the display of the gun satisfied the display of a firearm element. For the kidnapping conviction, the State argued that the display of the gun satisfied the restraint and transport by force or intimidation element. The remainder of the State's theory for the aggravated assault with intent to kill relates to Defendant's intent to kill Victim and Victim's understanding of this intent. Defendant's intent to "inflict death or physical injury" is also a pivotal component of the State's theory related to the kidnapping. As such, the aggravated assault with intent to kill conviction is subsumed into the kidnapping conviction, and, considering the State's theory here, "the statutes are the same for double jeopardy purposes—punishment cannot be had for both." *Swafford*, 1991-NMSC-043, ¶ 30.

**{36}**     As the aggravated assault with intent to kill conviction, a third degree felony, and the kidnapping conviction, a first degree felony, are violative of double jeopardy, the aggravated assault with intent to kill conviction must be vacated as the lesser of the two offenses. *See State v. Montoya*, 2013-NMSC-020, ¶ 55, 306 P.3d 426. We additionally observe that since the aggravated assault with a deadly weapon was subsumed in the aggravated assault with intent to kill and the aggravated assault with intent to kill

conviction is subsumed in the kidnapping conviction this necessarily means that the aggravated assault with a deadly weapon is subsumed into kidnapping as well.

## E.    Kidnapping and Attempted Murder

**{37}**    As to whether the kidnapping and attempted murder convictions were based on unitary conduct, we cannot conclude, based on the evidence presented and arguments, that the jury reasonably could have relied on independent factual bases. *See Cardenas*, 2025-NMSC-020, ¶ 58. The kidnapping jury instruction does not identify which conduct the jury should rely on to satisfy the injury element of the kidnapping offense and the attempted murder jury instruction does not indicate which particular act constituted a substantial part of the attempted killing. In closing, the State, aligned with its position on appeal—argued that the attempted murder happened at the bridge with the involuntary injection of heroin. As noted above, the State also highlighted the injection of heroin into Victim as one option to support finding the satisfaction of the injury element of the kidnapping conviction. However, the jury could have reasonably relied on this same evidence to satisfy the substantial part of the killing element of the attempted murder conviction. Therefore, on this record, we cannot conclude that the jury reasonably relied on independent factual bases for these two convictions. Accordingly, we proceed on the presumption that the conduct for the attempted murder and kidnapping charges was unitary.

**{38}**    In light of the presumption of unitary conduct when one of the "scenarios [relied upon] is legally inadequate" and the continuing nature of the first degree kidnapping offense and how it was presented to the jury, we hold that the presumption of unitary conduct is not rebutted regarding the kidnapping conviction's relationship with the aggravated assault with intent to kill and attempted murder convictions. *See Simmons*, 2018-NMCA-015, ¶ 27.

**{39}**    Defendant next urges that the legislative intent in regard to these convictions is ambiguous and the elements of attempted murder—the lesser of the two offenses—are subsumed into kidnapping such that a double jeopardy violation has occurred and the attempted murder conviction should be vacated. The State's presentation of the facts supporting the kidnapping conviction on appeal does not match the presentation of the evidence and arguments at trial, and we will not consider it here. *See Lorenzo*, 2024-NMSC-003, ¶ 11.

**{40}**    To find Defendant guilty of attempted murder, the State was required to prove beyond a reasonable doubt:

> 1.    [D]efendant intended to commit the crime of first degree murder by a deliberate killing;
>
> 2.    [D]efendant began to do an act which constituted a substantial part of the first degree murder by a deliberate killing but failed to commit the first degree murder by deliberate killing.

Because the attempted murder and kidnapping statutes do not expressly permit multiple convictions, *see* §§ 30-28-1; -2-1(A)(1); -4-1(A)(4), we consider whether the Legislature intended multiple punishments under the circumstances in this case. *See Begaye*, 2023-NMSC-015, ¶ 21. In doing so, we apply the modified *Blockburger* test, because the murder statute allows the crime to be accomplished "by any kind of willful, deliberate and premeditated killing," and the kidnapping statute allows the crime to be accomplished by "unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception," each of which can be achieved in multiple ways. *See* §§ 30-28-1; -2-1(A)(1); -4-1(A)(4). *See Begaye*, 2023-NMSC-015, ¶ 23 (providing that the reviewing court must "examine the statues at issue to discern whether the modified or strict-elements *Blockburger* test applies," and "should then apply either the modified or the strict-elements test—but not both").

**{41}**    During closing argument, the State identified several injuries resulting from the kidnapping conduct that the jury could consider during their deliberations: drugs injected into Victim's vein against her will, puncture marks, burning after bleach was poured in her eyes, difficulty moving a couple days after the events, as well as cuts and redness. Regarding acts constituting a substantial part of attempted first degree murder by deliberate killing, the State pointed to the injecting of heroin into Victim with the intent to make her death look like an overdose. Thus, the State's articulated theory relied, at least in part, on the injection of heroin—the puncture marks and the injection of heroin itself—to satisfy an element of the kidnapping and attempted first degree murder convictions. Further, Defendant's intent to kill Victim that evening was a necessary component of the State's theory in both. By proving first degree kidnapping in this broad manner, the State also proved the entirety of its case for attempted murder. *See State v. Luna*, 2018-NMCA-025, ¶ 17, 458 P.3d 457 (concluding that convictions did not survive the modified *Blockburger* test because "the jury could" have "convict[ed the d]efendant" for one crime "based on nothing more than the same evidence used to convict" the defendant of another crime").

**{42}**    In light of the State's theory here, the attempted murder conviction is subsumed into the first degree kidnapping, "and the statutes are the same for double jeopardy purposes—punishment cannot be had for both." *Swafford*, 1991-NMSC-043, ¶ 30; *see also Luna*, 2018-NMCA-025, ¶ 11 ("[If o]ne statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes—punishment cannot be had for both.").

**{43}**    The attempted murder conviction, a second degree felony, and the kidnapping conviction, a first degree felony, are violative of double jeopardy and as such the attempted murder conviction must be vacated as the lesser of the two offenses. *See Montoya*, 2013-NMSC-020, ¶ 55.

## F.    The Battery and Kidnapping Convictions Do Not Violate Double Jeopardy

**{44}**    Defendant contends that the first degree kidnapping and battery convictions violate double jeopardy because each required a finding of injury. Defendant argues

that because the jury could have interpreted kidnapping to encompass the entire sequence of events including the conduct of the battery and because the State pointed to "cuts and bruises" as one form of injury on which the jury could rely for kidnapping, the conduct punished was unitary. The State directs this Court to the jury instructions for the battery and kidnapping counts and argues that the conduct supporting the battery conviction was based on a discrete event that took place before the kidnapping. For the battery conviction, the State's arguments on appeal are consistent with the arguments made to the jury.

**{45}** To find Defendant guilty of battery, the State was required to prove beyond a reasonable doubt:

1. [D]efendant intentionally touched or applied force to [Victim] by striking her with his fists and feet;

2. [D]efendant acted in a rude, insolent or angry manner.

**{46}** "[W]hen the force used to commit a crime is separate from the force used to commit another crime," unitary conduct is not present. *Sena*, 2020-NMSC-011, ¶ 46. The kidnapping jury instructions specify the covering of Victim's face and moving her against her will as the force used. The force used in conducting the battery is identified in the jury instructions as "striking [Victim] with his fists and feet." While the evidence presented indicates that Defendant was wielding the gun while this striking of Victim occurred, the force identified in the battery instructions is distinct from any reasonable interpretation of the force or intimidation used in committing the kidnapping, despite the commonality of the presence of the gun. Notably, there is no evidence that Defendant struck Victim at any other time during the evening, nor that any striking was necessary to perpetuate the coercion used to sustain the kidnapping.

**{47}** We are satisfied that the force used and the nature and quality of the acts constituting the battery and kidnapping differed such that there are sufficient indicia of distinctness supporting the two convictions and they are not violative of double jeopardy.

## II. Sufficiency of Accomplice Testimony

**{48}** Defendant challenges the sufficiency of the evidence presented by the State in support of his convictions. "The test for sufficiency of the evidence is whether substantial evidence of either direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). In applying this test, we "view the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict, while at the same time asking whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Sena*, 2008-NMSC-053, ¶10, 144 N.M. 821, 192 P.3d 1198 (internal quotation marks and citations omitted).

**{49}** Defendant does not challenge a specific element of any of his convictions as unsupported by substantial evidence. Rather, disregarding the testimony of Victim and other evidence, Defendant contends that his convictions were largely based on Romero's testimony, which he suggests "should be accepted with caution" because she was an accomplice. "[T]he rule in this jurisdiction is that a defendant may be convicted on the uncorroborated testimony of an accomplice." *State v. Gutierrez*, 1965-NMSC-143, ¶ 4, 75 N.M. 580, 408 P.2d 503; *see also State v. Kidd*, 1929-NMSC-025, ¶ 3, 34 N.M. 84, 278 P. 214 ("The uncorroborated testimony of an accomplice is sufficient in law to support a verdict."). Because there is New Mexico Supreme Court precedent specifically acknowledging that a conviction based on accomplice testimony can be valid, this Court is in no position to limit or abrogate that precedent. *See Alexander v. Delgado*, 1973-NMSC-030, ¶¶ 8-10, 12, 14-15, 84 N.M. 717, 507 P.2d 778 (holding that the New Mexico Court of Appeals is bound by, and may not overrule or deviate from, New Mexico Supreme Court precedent). *See State v. Montoya*, 2016-NMCA-098, ¶¶ 23-24, 384 P.3d 1114 (refusing to depart from precedent establishing that a defendant may be convicted on the uncorroborated testimony of an accomplice when faced with defendant's argument that conviction based on testimony of codefendants was unsupported by substantial evidence).

**{50}** Recognizing that this Court cannot overrule Supreme Court precedent, Defendant nonetheless presents a stare decisis argument challenging our Supreme Court precedent regarding accomplice testimony, which we decline to address. This is not a case wherein the Defendant's convictions were obtained solely on uncorroborated accomplice testimony but, even if they were, this Court will neither reweigh the evidence in this context nor is it in a position to revisit longstanding Supreme Court precedent regarding the testimony of accomplices in criminal cases. *See Gutierrez*, 1965-NMSC-143, ¶ 4 ("[T]he rule in this jurisdiction is that a defendant may be convicted on the uncorroborated testimony of an accomplice."). As Defendant concedes, "this Court cannot overrule Supreme Court precedent."

### III. Admission of the Gun

**{51}** Defendant argues that the admission of the gun into evidence was an abuse of discretion. Defendant contends that the gun had limited probative value and unduly prejudiced Defendant because the State used the gun as propensity evidence. Defendant asserts that the alleged error in admitting the gun into evidence had a reasonable probability of affecting the verdict because "[t]he admission of a gun that no one identified as used in the alleged crimes helped the State to erroneously paint [Defendant] as 'the kind of person who would' commit these crimes." The State responds that there is a link between the gun and the crimes because a black handgun was used during the crimes and the gun found in Defendant's car during his arrest was a black handgun. The State further suggests that, because there was little emphasis on the gun, it only served to buttress the witness testimony, it was cumulative, and the admission of the gun did not amount to reversible error.

**{52}** Evidentiary rulings are reviewed for an abuse of discretion. *See State v. Flores*, 2010-NMSC-002, ¶ 25, 147 N.M. 542, 226 P.3d 641, *overruled on other grounds by State v. Martinez*, 2021-NMSC-002, ¶ 87, 478 P.3d 880. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize [the ruling] as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted).

**{53}** Rule 11-404(A)(1), (B)(1) NMRA prohibits the use of character evidence for the purpose of "prov[ing] that on a particular occasion the person acted in accordance with the character or trait" as well as the use of evidence of crimes, wrongs, or other acts for the purpose of "prov[ing] a person's character in order to show that on a particular occasion the person acted in accordance with the character." The district court explained admission of the gun was appropriate because it showed "[Defendant had] access to a firearm that is similar in description to that which is alleged to be in his possession on the day in question." Hence, admission of the black handgun, here, was not for the purposes of demonstrating Defendant's propensity for any particular behavior. Assuming without deciding that a gun may be evidence of a person's character, here, the gun was admitted to show that Defendant had the opportunity, by way of access, to use a gun to conduct the crime charged. *See* Rule 11-404(B)(1), (2) (permitting the admission of "a crime, wrong, or other act" to show "opportunity"). This is not impermissible under Rule 11-404. Accordingly, the reasoning articulated by the district court in admitting the gun is not clearly untenable or not justified by reason, and we therefore do not consider the admission of the gun into evidence to be an abuse of the district court's discretion. *See Rojo*, 1999-NMSC-001, ¶ 41.

**{54}** To the extent Defendant directed this Court to a portion of the State's closing argument that described the discovery of the gun upon Defendant's apprehension, we note that Defendant did not object when the State argued that the discovery of the gun at the very least showed that Defendant "is an individual who carries a gun near him at all times" and "corroborates that he was the kind of person who would hand a gun to [Romero] to hold against [Victim's] head."[3] Moreover, in line with the reasoning above, we do not construe the State's first argument to suggest Defendant's propensity to commit a crime, but rather to explain why the gun corroborated the testimony provided by Victim and Romero.

## IV. Ineffective Assistance of Counsel

**{55}** Defendant contends that he received ineffective assistance of counsel. In support thereof, Defendant contends: (1) he filed a pro se motion to exclude all evidence, alleging that officers involved in his case had tampered with evidence and attempted "to

---

[3]Defendant argues on appeal that the district court abused its discretion in admitting the gun during the State's case in chief over a Rule 11-403 NMRA objection. In doing so, Defendant raises statements made during closing arguments that were not objected to but does not ask this Court to review such statements for, nor does Defendant present an argument as to, fundamental error.

get him to sign a waiver of wrongdoing"; (2) his first counsel moved to withdraw citing a breakdown in the attorney-client relationship, which the district court granted; and (3) he twice informed the district court that he was unhappy with his second court appointed counsel, including informing the district court on the morning of trial that his attorney was not prepared for trial.

**{56}**   "We review claims of ineffective assistance of counsel de novo." *State v. Pitner*, 2016-NMCA-102, ¶ 14, 385 P.3d 665 (internal quotation marks and citation omitted). "[T]here is a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Garcia*, 2011-NMSC-003, ¶ 33, 149 N.M. 185, 246 P.3d 1057 (internal quotation marks and citation omitted). "We assume that attorneys represent their clients honorably, consistent with both their professional duties and the terms under which they contract with the [Law Office of the Public Defender] to provide indigent defense." *Kerr v. Parsons*, 2016-NMSC-028, ¶ 25, 378 P.3d 1.

**{57}**   "In order to establish a prima facie case of ineffective assistance of counsel on direct appeal, a defendant must demonstrate: (1) counsel's performance fell below that of a reasonably competent attorney; (2) no plausible, rational strategy or tactic explains counsel's conduct; and (3) counsel's apparent failings were prejudicial to the defense." *State v. Bahney*, 2012-NMCA-039, ¶ 48, 274 P.3d 134. Because the record is frequently insufficient to establish whether an action taken by defense counsel was not reasonable or if an error caused prejudice, ineffective assistance of counsel claims are often better addressed in habeas corpus proceedings. *See State v. Arrendondo*, 2012-NMSC-013, ¶ 38, 278 P.3d 517. However, if on direct appeal a defendant makes a prima facie case for ineffective assistance of counsel on the basis of facts in the record, an appellate court can remand to the district court for an evidentiary hearing. *See State v. Crocco*, 2014-NMSC-016, ¶ 14, 327 P.3d 1068. A defendant makes a prima facie case when the defendant produces sufficient evidence to allow the trier of fact to infer the fact at issue and rule in the defendant's favor. *See id.*

**{58}**   Absent any facts demonstrating specific incidents of deficient representation in this case or showing how counsel's representation resulted in prejudice, we conclude that Defendant's vague allegations are insufficient to establish a prima facie case of ineffective assistance of counsel. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be."). This determination does not preclude Defendant's ability to bring this claim through a habeas corpus petition. *See Duncan v. Kerby*, 1993-NMSC-011, ¶ 4, 115 N.M. 344, 851 P.2d 466 (recognizing New Mexico case law's preference for "habeas corpus proceedings . . . for adjudicating ineffective assistance of counsel claims").

## CONCLUSION

**{59}**   We reverse and remand for the district court (1) to vacate Defendant's convictions for aggravated assault with intent to kill, aggravated assault with a deadly

weapon and attempted murder; (2) to resentence Defendant; and (3) to enter an amended judgment. We otherwise affirm.

**{60}　IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Chief Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**KATHERINE A. WRAY, Judge**